Slip Op. 14-118

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————
MID CONTINENT NAIL CORP.,     :
     :
        Plaintiff,     :    Before: Nicholas Tsoucalas,
     :        Senior Judge
    v.     :
     :    Court No.: 10-00247
UNITED STATES,     :
     :
        Defendant,     :
     :
        and     :
     :
TARGET CORP.,     :
     :
        Defendant-Intervenor. :
———————————————————————

## OPINION

[Redetermination upon remand by the Department of Commerce was not supported by substantial evidence nor in accord with the law.]

Dated: October 6, 2014

Adam H. Gordon and Jordan C. Kahn, Picard Kentz & Rowe LLP, of Washington, DC, for Mid Continent Nail Corporation, plaintiff.


Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant. Of counsel on the brief was Nathaniel J. Halvorson, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.


Marguerite E. Trossevin and James J. Jochum, Jochum Shore & Trossevin, PC, of Washington, DC, for Target Corporation, defendant-intervenor.

      **Tsoucalas, Senior Judge:** before the court are the final results of defendant United States Department of Commerce's ("Commerce") redetermination of its scope ruling on nails within toolkits imported by Target Corporation ("Target"). <u>See</u> <u>Final Results of Redetermination Pursuant to Remand Order</u>, ECF No. 99 (Apr. 30, 2014) ("<u>Third Remand Results</u>"). Commerce found that the nails were outside the scope of the antidumping duty order on nails from the People's Republic of China ("PRC") because they were part of a mixed-media set. <u>Id.</u> at 51. Plaintiff Mid Continent Nail Corp. ("MCN") contests the <u>Third Remand Results</u> and requests another remand of this case. <u>See</u> Pl.'s Cmts. on Remand Results, ECF No. 104 (June 27, 2014). Commerce and defendant-intervenor disagree, insisting that Commerce should affirm the <u>Third Remand Results</u>. <u>See</u> Def.-Int.'s Cmts. on Def.'s Redetermination Pursuant to Remand Order, ECF No. 103 (June 27, 2014); Def.'s Cmts. on Redetermination Pursuant to Remand Order, ECF No. 113 (July 31, 2014).

## BACKGROUND

### A. Antidumping Duty Order and Initial Scope Ruling

      In August 2008, Commerce issued an antidumping order covering steel nails from the PRC. <u>See</u> Notice of Antidumping Duty Order: Certain Steel Nails from the PRC, 73 Fed. Reg. 44,961 (Aug. 1, 2008) ("<u>Nails Order</u>"). The <u>Nails Order</u> covers:

> certain steel nails having a shaft length up to 12
> inches. Certain steel nails include, but are not limited
> to, nails made of round wire and nails that are cut.
> Certain steel nails may be of one piece construction or
> constructed of two or more pieces. Certain steel nails
> may be produced from any type of steel, and have a
> variety of finishes, heads, shanks, point types, shaft
> lengths and shaft diameters.  Finishes include, but are
> not limited to, coating in vinyl, zinc (galvanized,
> whether by electroplating or hot-dipping one or more
> times), phosphate cement, and paint. Head styles
> include, but are not limited to, flat, projection,
> cupped, oval, brad, headless, double, countersunk, and
> sinker. Shank styles include, but are not limited to,
> smooth, barbed, screw threaded, ring shank and fluted
> shank styles. Screw-threaded nails subject to this
> proceeding are driven using direct force and not by
> turning the fastener using a tool that engages with the
> head. Point styles include, but are not limited to,
> diamond, blunt, needle, chisel, and no point. Finished
> nails may be sold in bulk, or they may be collated into
> strips or coils using materials such as plastic, paper,
> or wire.

Id. at 44,961–62.  The scope language also identifies several

exclusions to the Nails Order, including "roofing nails,"

"corrugated nails," "fasteners suitable for use in power-actuated

hand tools," "thumb tacks," nails of certain size specifications

that are "collated with adhesive or polyester film tape back with

a heat seal adhesive," and fasteners meeting certain

specifications.  Id. at 44,962.

Target imports toolkits from the PRC, which include

various household tools.  See Mid Continent Nail Corp. v. United

States, 35 CIT __, __, 770 F. Supp. 2d 1372, 1375 (2011) ("MCN

I").  Of particular relevance to the instant case, the toolkits

"include a plastic container holding approximately fifty one-inch brass coated steel nails." Id., 770 F. Supp. 2d at 1375.  Target requested a scope ruling from Commerce that six of its tool kits containing these nails are outside the Nails Order.  Id.; 770 F. Supp. 2d at 1375.   Although it conceded that the nails in the toolkit would be in-scope merchandise if considered on their own, Target insisted that Commerce should focus on the toolkits as a whole.  In support of its argument, Target noted that the Nails Order did not mention nails packaged with non-scope merchandise and that Commerce previously considered similar "mixed media" items as a whole.  Id.

        Commerce issued its scope ruling in August 2010.  See Final Scope Ruling – Certain Steel Nails from the PRC, Request by Target (Aug. 10, 2010) ("Scope Ruling").  Commerce first noted that the 19 C.F.R. § 351.225(k)(1) factors ("(k)(1) factors") were not dispositive as to whether the scope covered brass coated steel nails in toolkits.  Id. at 5.  Commerce then applied the 19 C.F.R. § 351.225(k)(2) factors ("(k)(2) factors"), considering the tool kit as a set including the subject merchandise.  Id.  Based on this analysis, Commerce found that the tool kits were outside the scope of the Nails Order.  Id.

### B. Proceedings Before the Court of International Trade and Remand Redeterminations

This Court rejected Commerce's analysis in the <u>Scope Ruling</u>, finding that Commerce failed to articulate adequate reasoning for its decision to focus the scope inquiry on the toolkits rather than the nails.  <u>See</u> <u>MCN I</u>, 35 CIT at __, 770 F. Supp. 2d at 1379-83.  The Court remanded the <u>Scope Ruling</u> so that Commerce could identify a test for making such a determination[1] and provide legal justification for that test.  <u>Id.</u> at __, 770 F. Supp. 2d at 1382-83.

On remand, Commerce found that it had the authority to consider mixed-media items as a set.  <u>See</u> <u>Final Results of Redetermination Pursuant to Remand Order</u> at 2-5 (Oct. 17, 2011) ("<u>First Remand Results</u>").  It then articulated a four-factor test for answering the <u>Walgreen</u> question: (1) the practicability of separating the component merchandise for repackaging or resale; (2) the value of the component merchandise as compared to the value of the product as a whole; (3) the ultimate use or function of the component merchandise relative to the ultimate use or function of the mixed-media set as a whole; and (4) any other relevant factors that may arise on a product-specific basis.  <u>Id.</u> at 7-11.  Using this test, Commerce found that the toolkit as a whole was the

---

[1] Whether Commerce should focus a mixed-media scope inquiry on the set as a whole or on the individual component that appears to be within the scope of the order is referred to as the "Walgreen question."  This name refers to the decision of the Court of Appeals for the Federal Circuit in <u>Walgreen Co. of Deerfield, Inc. v. United States</u>, 620 F.3d 1350 (Fed. Cir. 2010).

proper focus of the scope inquiry. <u>Id.</u> at 11-14. It then determined that the toolkit was outside the scope of the <u>Nails Order</u>. <u>Id.</u> at 14-18.

Upon review of the <u>First Remand Results</u>, the Court found that Commerce's analysis was improper because Commerce did not have the authority to conduct a mixed-media analysis. <u>See</u> <u>Mid Continent Nail Corp. v. United States</u>, 36 CIT __, __, 825 F. Supp. 2d 1290, 1296 (2012) ("<u>MCN II</u>"). The Court remanded for further proceedings consistent with its opinion that "the nails in question here are unambiguously subject to the <u>Nails Order</u>, and there is no support in the law or the record for concluding otherwise." <u>Id.</u>, 825 F. Supp. 2d at 1296.

In its second redetermination, Commerce issued a ruling consistent with the Court's decision in <u>MCN II</u>. <u>See</u> <u>Final Results of Redetermination Pursuant to Remand Order</u> at 5 (Mar. 7, 2012) ("<u>Second Remand Results</u>"). Specifically, Commerce found that the nails in the toolkits were within the scope of the <u>Nails Order</u>. <u>Id.</u> The Court upheld the <u>Second Remand Results</u> in their entirety, <u>see</u> <u>Mid Continent Nail Corp. v. United States</u>, 36 CIT __, __, Slip Op. 12-97 at 1 (July 25, 2012), and Commerce appealed to the United States Court of Appeals for the Federal Circuit ("CAFC").

### C. CAFC Determination

On appeal, the CAFC reversed the CIT's opinion in <u>MCN II</u>. <u>See</u> <u>Mid Continent Nail Corp. v. United States</u>, 725 F.3d 1295,

1301 (Fed. Cir. 2013) ("MCN III").  Specifically, the CAFC found

that the CIT's holding that Commerce lacked authority to conduct

a mixed-media inquiry was erroneous.  It also found that Commerce

had yet to reasonably interpret the Nails Order in such a way as

to justifiably exclude the nails in Target's toolkits from the

scope, noting that the fourth factor of the mixed-media test was

overly broad.  Id.  The CAFC provided Commerce with guidance for

its remand redetermination, stating that "any implicit mixed-media

exception to the literal scope of the order must be based on

preexisting public sources," and that "Commerce may attempt to

draw an ascertainable standard from these rulings if they were

publicly available at the time the [Nails Order] was issued . . .

."  Id. at 1305.

### D. Third Remand Redetermination

In its third remand results, Commerce attempted to find

a test by which it could determine whether to focus its scope

ruling on the mixed-media set as a whole or on the individual

component.  Third Remand Results at 6–17.  First, Commerce noted

that "mixed-media" scope inquiries "involve merchandise that

includes a component that appears to at least have some superficial

overlap with the literal language of the order, but also consists

of elements that do not appear to be covered by the literal

language of the order."  Id. at 6.  Commerce also noted that the

outcome of these scope inquiries depends largely on whether

Commerce treats the set as a whole or whether it focuses on the individual component that appears to be covered by the order.  Id.

Next, Commerce surveyed the available scope rulings on "mixed-media" products to determine whether there was a common analytical framework for determining the proper focus a "mixed-media" scope inquiry.  Id. at 9–16.  Commerce altered the four-factor test it previously articulated in the First Remand Results taking into account these rulings and the CAFC's ruling in MCN III, listing the factors as (1) the "unique language of the order"; (2) the "practicability of separating the component merchandise for repackaging or resale"; (3) the "value of the component merchandise as compared to the value of the product as a whole"; and (4) the "ultimate use or function of the component merchandise relative to the ultimate use or function of the mixed-media set as a whole".  Id. at 17.  Where Commerce finds that it should analyze the product as a whole set it will move straight to the (k)(2) factors, but where it will analyze the individual component Commerce will make its scope determination based on the (k)(1) factors.  Id. at 20.

Commerce then applied this test to Target's toolkits. Id. at 23–26.  Commerce found that the language of the Nails Order describes the nails in question but does not address merchandise contained in toolkits, the packaging of nails with other products, or the arrangement of the nails upon importation.  Id. at 23–24.

As for the relative value of the nails, Commerce found that it was very small in light of Target's statement that the total value of the nails was a "small percentage" of the value of the toolkit as a whole. Id. at 24.  Commerce also determined that separating and repackaging the nails was not practicable because the nails were packaged with non-subject fasteners in a smaller case within the toolkit. Id. at 24-25.  Finally, Commerce found that the use of the nails, fastening two objects together, was complementary to but distinct from the use of the toolkit, which was "provid[ing] a convenient collections of tools and accessories for the intention of home repair and maintenance." Id. at 25.  It added that there was a variety of tools and accessories, each of which had specialized uses, so the choice of toolkit would not be based exclusively on the type of nail inside tool kit.  Id. at 25-26. Because each factor of the test indicated that Commerce should evaluate the toolkits as a whole, Commerce determined that it should focus the scope inquiry on the toolkits rather than the steel nails.  Id. at 26.

Because it was focusing on the toolkits as a whole, Commerce moved directly to an analysis of the (k)(2) factors.  Id. Commerce analyzed each of the six toolkits at issue, determining that they "include some merchandise that at least superficially meets the physical description of the merchandise subject to the Nails Order and some merchandise which clearly does not meet the

physical description of the merchandise subject to the Nails Order.
Id. at 26-29.   Commerce also noted that the brass coated nails
contained within the toolkits comprise, at most, a tangential
feature in the advertising" of Target's toolkits.   Id. at 29-30.
Commerce also noted that the display of the toolkits varied across
Target stores: in some cases the toolkits were displayed alongside
subject nails, but in other stores the toolkits were not displayed
by subject nails. Id. at 30.  Commerce also found that the channels
of trade factor was inconclusive, as the toolkits and nails shared
certain channels of trade, but there were also channels of trade
that were distinct for the two products.   Id. at 30-31.
Additionally, Commerce found that the expectations of the ultimate
purchaser differed as between toolkits and nails, because the
purchaser of the former expected to purchase an assortment of tools
for an assortment of functions at a price of $25 to $60, while a
purchaser of in-scope nails would expect more nails and a lower
price.   Id. at 31.  Commerce noted that the majority of the tools
in Target's toolkits are not used with nails.  Id.  Commerce made
similar findings with regard to the ultimate use of the product,
as Target's toolkits serve to "aid in various repair tasks" in the
home, while the in-scope nails are used to hang or fasten objects.
Id. at 32.  Noting that three of the five (k)(2) factors support
a finding that the toolkits are outside the scope of the Nails
Order, and that the other two factors were inconclusive, Commerce

found that Target's toolkits were outside the scope of the <u>Nails Order</u>.  <u>Id.</u> at 32.

      Commerce also addressed comments by the parties on its determination relevant to the instant litigation.  First, Commerce rejected MCN's assertion that the determination was unauthorized rule making because it was simply resolving a gap in the statute and regulations by clarifying existing procedures and providing a justification for those procedures.  <u>Id.</u> at 35.  Second, Commerce rejected MCN's argument that the prior scope rulings were not publicly available because they the scope rulings were "available in [Commerce]'s Central Records Unit public reading room and listed in the quarterly published list of scope rulings."  <u>Id.</u> at 38.  Finally, Commerce found that, contrary to MCN's insistence, both the mixed-media analysis and the (k)(2) factors analysis were supported by substantial evidence and consistent with law.  <u>Id.</u> at 42-51.

### JURISDICTION and STANDARD OF REVIEW

      The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and section 516A(a)(2)(B)(vi) of the Tariff Act of 1930,[2] as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) (2006).

---

[2] All further references to the Tariff Act of 1930 will be to the relevant provisions of Title 19 of the United States Code, 2006 edition, and all applicable supplements thereto.

The Court must uphold Commerce's scope determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing a scope ruling, the Court grants "significant deference to Commerce's interpretation of its own orders." Allegheny Bradford Corp. v. United States, 28 CIT 830, 842, 342 F. Supp. 2d 1172, 1183 (2004). "However, Commerce cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1095 (Fed. Cir. 2002) (citing Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001)).

**DISCUSSION**

**I. Commerce's Methodology**

MCN contests the following aspects of Commerce's method for answering the Walgreen question in its Third Remand Results: (1) Whether Commerce's refusal to conduct notice and comment rulemaking was consistent with the requirements of the APA; (2) whether Commerce complied with the direction of the CAFC in MCN III when deriving the mixed media test; and (3) whether Commerce's application of its four factor mixed media test was supported by substantial evidence.

**A. Commerce was not required to conduct notice-and-comment rule making.**

The first issue before the court is whether Commerce's attempt to answer the <u>Walgreen</u>'s question through its adoption of the four-factor mixed media test violated the notice-and-comment rule making procedures required under the Administrative Procedures Act ("APA").

MCN argues that Commerce's adoption of the four-factor mixed media test was improper because Commerce promulgated a new rule without the notice-and-comment rulemaking procedures required under the APA. Pl.'s Cmts. at 6. MCN insists that the APA mandates that a test of this nature must "occur with particularized notice and comment" procedures. <u>Id.</u> MCN also insists that the CAFC recognized the benefit of formal rule-making for this issue in <u>MCN III</u> and that Commerce could have reasonably foreseen the need for such rule-making given the need to "address mixed media scope inquiries in a comprehensive manner." <u>Id.</u> at 10.

The court must reject MCN's arguments. The CAFC specifically spoke to this issue in <u>MCN III</u>, stating that "Commerce may attempt to draw an ascertainable standard" from "pre-existing public sources" as long as they were publicly available at the time the <u>Nails Order</u> was issued. <u>MCN III</u>, 725 F.3d at 1305. Thus, the CAFC explicitly granted Commerce the ability to attempt to support a mixed media standard without conducting notice-and-comment under the APA in their <u>Third Remand Results</u>, so long as

Commerce's test complied with the CAFC's <u>MCN III</u> guidelines.  <u>See</u>
<u>id.</u>

### B. Commerce's mixed media test failed to comply with the direction of the CAFC in <u>MCN III</u>

The next issue before the court is whether Commerce's
mixed media test complied with the CAFC's instructions in <u>MCN III</u>.
As discussed above, in <u>MCN III</u>, the CAFC instructed Commerce that
"any implicit mixed-media exception to the literal scope of the
order must be based on preexisting public sources," and that
"Commerce may attempt to draw an ascertainable standard from these
rulings if they were publicly available at the time the [<u>Nails</u>
<u>Order</u>] was issued . . . ."  <u>MCN III</u>, 725 F.3d at 1305.

The court must first address whether Commerce relied on
publicly available scope determinations issued before the <u>Nails</u>
<u>Order</u> to support its mixed media test in the <u>Third Remand Results</u>.
The scope rulings Commerce relied on were published quarterly in
the Federal Register, and were available for public viewing in
Commerce's Public File Room.  <u>See</u> <u>Third Remand Results</u> at 18.
Because these scope rulings were publically available, this court
will allow Commerce to attempt to support its mixed media analysis
based on sources that were publically available at the time the
<u>Nails Order</u> was issued.

Commerce constructed its mixed media test in order to
answer the <u>Walgreen</u> question, which addresses whether Commerce

should focus its scope ruling on the mixed media set as a whole or on the individual components. Third Remand Results 6-17. Commerce relied on prior scope rulings in order to construct the mixed media test from a common set of analytical principles. Id. at 9-17. The mixed media test consisted of four factors: (1) the "unique language of the order"; (2) the "practicability of separating the component merchandise for repackaging or resale"; (3) the "value of the component merchandise as compared to the value of the product as a whole"; and (4) the "ultimate use or function of the component merchandise relative to the ultimate use or function of the mixed-media set as a whole." Id. at 17. Commerce insists that "these four factors articulate the common principles relied upon in [its] prior scope rulings and throughout [its] past practice." Id. at 17.

In the first set of scope rulings relied on by Commerce to support its mixed media test, Commerce focused on the product as a whole and found the requested product to be outside the class or kind of merchandise subject to the order. See Final Scope Ruling – Antidumping Duty Order on Certain Cased Pencils from the PRC – Request by Creative Designs Naturally Pretty (February 9, 1998) (concluding that pencils contained within a vanity set were not subject to the order on pencils from the PRC)("Vanity Set Scope Ruling"); See Final Scope Ruling – Antidumping Duty Order on Certain Cased Pencils from the PRC – Request by Dollar General

Corporation at 3, (April 6, 2001) ("The issue presented by this
scope inquiry is whether Dollar's [stationery sets], which include
a 3 1/4-inch or 4 1/2-inch pencil, are within the scope of the
order on certain cased pencils from the PRC.") ("Stationery Sets
Scope Ruling");  See Final Scope Ruling – Antidumping Duty Order
on Certain Cased Pencils from the PRC – Request by Target
Corporation Regarding "Hello Kitty Fashion Totes" at 4, (September
29, 2004) ("[Commerce] observe[d] that the Totes include a single
pencil which, considered individually, is covered by the scope of
the order. The Totes are multimedia sets, however . . . [and] the
scope of the order does not contemplate mixed-media sets.")("Totes
Scope Ruling");  See Final Scope Ruling - Antidumping Duty Order
on Certain Cased Pencils from the PRC - Request by Target
Corporation, (March 4, 2005) (concluding that art sets containing
subject pencils and other non-subject art supplies were outside
the scope of the order) ("Art Sets Scope Ruling");  See Final Scope
Ruling - Antidumping Duty Order on Certain Cased Pencils from the
PRC - Request by Fiskars Brands, Inc., (June 3, 2005) (concluding
that compasses containing subject pencils were outside the scope
of the order) ("Compass Scope Ruling")  See Final Scope Ruling -
Antidumping Duty Order on Certain Lined Paper Products from the
People's Republic of China, Request by Avenues in Leather, Inc.,
(May 8, 2007) (concluding that padfolio containing subject lined
paper pads were outside the scope of the order) ("Padfolios Scope

Ruling") <u>See Certain Lined Paper Products from the People's Republic of China - Davis Group of Companies Corp. Scope Ruling Request</u>, (February 21, 2008) (concluding that padfolios containing subject lined paper pads were outside the scope of the order) ("<u>Davis Padfolios Scope Ruling</u>").

        In the second set of scope rulings relied on by Commerce to support its mixed media test, Commerce focused on the component and found the requested product to be within the class or kind of the merchandise subject to the order. <u>See Recommendation Memo -- Final Scope Ruling on the Request by Texsport for Clarification of the Scope of the Antidumping Duty Order on Porcelain-on-Steel Cooking Ware from the PRC</u>, (August 8, 1990) (concluding that porcelain-on-steel cookware imported as part of a camping set was subject to the order) ("<u>Cookware Scope Ruling</u>"); <u>See Final Determination of Sales at Less Than Fair Value: Fresh Cut Roses from Ecuador</u>, 60 Fed. Reg. 7019, (February 6, 1995) (roses individually dutiable in mixed flower bouquet) ("<u>Bouquets Scope Ruling</u>").

        MCN argues that the scope rulings Commerce relied upon to articulate the four-factor test it used in the <u>Third Remand Results</u> "cannot and do not create a generally applicable analytical framework" for addressing the <u>Walgreen</u> question. <u>Id.</u> at 17. MCN insists that the scope rulings are isolated, contradictive, and generally do not provide any guidance to respondents. <u>Id.</u>

MCN notes that, in MCN III, the CAFC recognized a presumption that components of a mixed media set that meet the physical specifications of an order are presumed to be within the scope of that order. Id. at 10. MCN also notes that Commerce recognized that the nails in Target's toolkits, if analyzed alone, would be subject to the Nails Order. Id. MCN argues that Commerce failed to overcome this presumption, instead providing an "outcome determinative" analysis that relied on scope rulings that were "entirely devoid of reasoning that could provide guidance for future cases." Id. at 11. Ultimately, MCN concludes that the "ad-hoc" determinations did not provide a standard or consistent practice upon which to base Commerce's methodology. Id. at 12–13. MCN also argues that Commerce should have relied on evidence like the Harmonized Tariff Schedule of the United States ("HTSUS") to consider whether there was sufficient evidence to overcome the presumption that the nails in Target's toolkits were subject to the Nails Order.

The court finds that Commerce failed to comply with the direction of the CAFC for the following reasons. First, Commerce failed to demonstrate how the "unique language of the order" is relevant to its mixed media test. Commerce supported the inclusion of this factor by attempting to identify a standard derived from the Cookware Scope Ruling and Bouquets Scope Ruling. Third Remand Results at 7–11.

The prior scope rulings Commerce relies on to support including the unique language of the order as a factor in its mixed media test fail to support an ascertainable mixed media standard. Unlike in the instant case where the scope language is silent, in both the Cookware Scope Ruling and the Bouquets Scope Ruling, the language of the order clearly addresses all of the relevant merchandise in the mixed media set. For instance, in the Cookware Scope Ruling, Commerce determined whether "kitchenware" and "cookware" imported together as part of a mixed media set were subject to the order. Commerce found that only the "cookware" within the set was dutiable because "kitchenware" was "specifically excluded from the order." Cookware Scope Ruling at 4. Because the scope language was clear, Commerce declined to conduct a mixed media analysis. Id. at 2. Similarly, in the Bouquets Scope Ruling, Commerce once again avoided conducting a mixed media analysis when determining whether roses imported within bouquets including non-dutiable flowers would be subject to the order at issue. Bouquets Scope Ruling, 60 Fed. Reg. at 7022. The language of the order contemplated bouquets, eliminating any need for Commerce to conduct a mixed media analysis. Id.

In the Third Remand Results, Commerce insists that the language of the order controls the mixed media analysis and "informs the application" of the remaining factors in its mixed media test. Third Remand Results at 21. Commerce argues that

"[b]y looking at the language of the order, [Commerce] can determine where such an analysis is warranted, either from the silence of the order or language in the order speaking to these factors." Id. Commerce failed to support this contention. Apart from the fact that both of these scope rulings involve a mixed media set, neither scope ruling contemplated a mixed media analysis. Furthermore, it is well established that "the process must begin with the language of the order, which provides the 'predicate for the interpretive process,'" but these scope rulings do not provide guidance with regards to how this factor is relevant to a mixed media analysis. MCN III 725 F.3d at 1303 (citing Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). Where the scope language is clear, like in the Cookware Scope Ruling and Bouquets Scope Ruling, "scope analysis [is] at an end." See id.

Secondly, the Cookware Scope Ruling and Bouquets Scope Ruling cannot be reconciled with the seven other scope rulings Commerce cited in its Third Remand Results. None of the remaining scope rulings contain orders which clearly address the subject merchandise or the mixed media set. The remaining scope rulings appear to be isolated examples of how the test is outcome determinative as to whether Commerce finds that the mixed media set is subject to the order. All of the remaining scope rulings contain an ambiguous order, and rely on the (k)(2) factors in order

to justify excluding the subject merchandise from the scope of the order.  Additionally, the nine scope rulings rely on a number of different bases for excluding a product from the scope of an order.  Third Remand Results at 9-16.  For instance, in the Vanity Set Scope Ruling Commerce found as a "threshold matter" that it would treat the vanity set as a whole set, rather than analyzing the pencils included in the set individually.  See Third Remand Results at 11; Vanity Set Scope Ruling at 4.  Commerce determined the answer to the Walgreen question on the basis that the pencil included within the vanity set was only a "minor component" of the mixed media set.  Vanity Set Scope Ruling at 4.  This resulted in Commerce limiting its analysis of the (k)(2) factors to only the whole set, and thus, Commerce determined that the vanity set was excluded from the scope of the order on pencils from the PRC.  Id. at 4-8.  Furthermore, in the Compass Scope Ruling, Commerce chose to answer the Walgreen question primarily by weighing the (k)(2) factors and concluding that the purchaser's ultimate expectation was to obtain a "drawing tool" as opposed to obtaining a pencil to be used for writing.  Compass Scope Ruling at 8.  Contrary to Commerce's assertions, these scope rulings appear to answer the Walgreen question based on the facts and circumstance in each particular case, and do not identify a broader ascertainable mixed media standard.

Thirdly, Commerce argues that its mixed media test occurs "within the context" of the (k)(1) factors. Third Remand Results at 36. It is unclear to the court how this test occurs within the (k)(1) factors. Commerce relies on scope rulings which answer the Walgreen's question based on the (k)(2) factors. See Vanity Set Scope Ruling; Stationery Sets Scope Ruling; Totes Scope Ruling; Art Sets Scope Ruling; Compass Scope Ruling; Padfolios Scope Ruling; Davis Padfolios Scope Ruling. Thus, in the Third Remand Results, Commerce attempts to imbed its test within the (k)(1) factors by using "ad-hoc" determinations that do not provide an "ascertainable standard that would allow importers to predict how Commerce would treat their mixed media products." MCN III, 725 F.3d at 1305.

Furthermore, MCN correctly notes that in MCN III the CAFC did in fact recognize a presumption that components of a mixed media set that meet the physical specifications of an order are presumed to be within the scope of that order. See MCN III, 725 F.3d at 1304. In this case, neither party disputes the fact that the nails contained in Target's toolkits "meet the physical characteristics of the nails subject to the scope of the Nails Order." Third Remand Results at 28-29. The CAFC stated that "[i]n order to overcome this presumption Commerce must identify published guidance issued prior to the date of the original antidumping order . . . that provides a basis for interpreting the

order contrary to its literal language." See <u>MCN III</u>, 725 F.3d at

1304.  Here, Commerce failed to explicitly address how its mixed

media test reflects this presumption at any point in the <u>Third</u>

<u>Remand Results</u>.

Ultimately, Commerce's mixed media test fails to comply

with the instructions the CAFC articulated in <u>MCN III</u>, which

required Commerce to draw an ascertainable mixed media standard

from information that was publically available at the time the

<u>Nails Order</u> was issued.  These nine scope rulings do not identify

a coherent and ascertainable standard encompassing all of the

factors in Commerce's mixed media test, and thus, they do not

provide guidance that would allow importers to predict how Commerce

would treat their mixed media products.  Because Commerce's test

is inconsistent with <u>MCN III</u>, this court declines to find whether

Commerce's application of its four-factor mixed media test was

supported by substantial evidence.

## Conclusion

For the reasons discussed above, this case is remanded

to Commerce for further proceedings consistent with this opinion,

it is hereby

**ORDERED** that the <u>Final Results of Redetermination</u>

<u>Pursuant to Remand Order</u> is to be remanded to the United States

Department of Commerce for reconsideration of its mixed media

standard in accordance with the United States Court of Appeals for

the Federal Circuit's decision in <u>Mid Continent Nail Corp. v. United States</u>, 725 F.3d 1295 (Fed. Cir. 2013).


                                        /s/ Nicholas Tsoucalas
                                        **Nicholas Tsoucalas**
                                        **Senior Judge**

**Dated:**   October 6, 2014
             **New York, New York**